[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15558
_____

D.C. Docket No. 3:11-cr-00124-RBD-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

KAREEN RASUL GRIFFIN,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 2, 2012)

Before DUBINA, Chief Judge, JORDAN and ALARCÓN,* Circuit Judges.

JORDAN, Circuit Judge:

_____

* Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Does a constitutionally valid stop and frisk become unreasonable under the Fourth Amendment when the officer asks some brief questions unrelated to the reason for the stop and the purpose of the frisk? The district court thought so, and suppressed the answers to those questions and ammunition found after the answers were provided. We reverse, concluding that the questions posed did not convert a permissible encounter into an unconstitutional one.

## I

Fourth Amendment cases are inherently fact-intensive, so we begin with the district court's factual findings, which are not challenged on appeal.

On February 22, 2011, Officer Jay Edwards, a patrol officer with the Jacksonville Sheriff's Office, responded to an unverified 911 call from Rainbow Kids, a children's clothing store in Jacksonville, Florida.[1] Officer Edwards was familiar with the strip mall where the store was located. He knew that there was drug activity in the surrounding area and that there had been several burglaries in the mall.

Officer Edwards arrived at approximately 8:57 p.m. The store's security guard came running out and informed him that a man had attempted to steal some clothing. The guard pointed to and identified a male walking quickly away from the store as

---

[1] An unverified 911 call, Officer Edwards testified, is one in which someone places an emergency call but does not say anything to the operator.

the person who committed the attempted theft. There were six to eight people in the direction where the guard pointed, but Mr. Griffin was the only one who fit the guard's description of "the black man in the green jacket and jeans."

Returning to his vehicle, Officer Edwards followed Mr. Griffin, who continued to look over his shoulder and walk away briskly. Officer Edwards got out of his car and told Mr. Griffin to stop. When Mr. Griffin disobeyed his command and continued to walk away—in what the district court described as evasive behavior—Officer Edwards approached Mr. Griffin, put both hands on one of his wrists, and informed him that he was investigating a petit theft. Mr. Griffin said that he had not stolen anything. Officer Edwards nevertheless frisked Mr. Griffin to ensure his own safety.

During the frisk, Officer Edwards felt what he "believed to be" C-cell batteries in Mr. Griffin's back left pocket. Officer Edwards did not, however, reach into the pocket. Instead, because he "wasn't exactly sure what [the items] were," and because "it was odd that someone was carrying around . . . C-cell batteries," he asked Mr. Griffin, "Hey, what's in your pocket? Why do you have batteries?" *See* R2:10, 30, 33. Mr. Griffin responded that the items were shotgun shells and not batteries. Officer Edwards then asked Mr. Griffin if he had ever been to prison, and Mr. Griffin answered "yes." *See* R2:11. After Officer Edwards informed him that it was illegal for felons to possess weapons or ammunition, Mr. Griffin began to flee. Officer

3

Edwards eventually arrested Mr. Griffin, who was charged with being a felon in possession of ammunition. *See* 18 U.S.C. § 922(g)(1).

Mr. Griffin moved to suppress the ammunition and the statements he made to Officer Edwards. Following an evidentiary hearing, the district court granted the motion to suppress. The district court found that the initial stop by Officer Edwards was proper, but even assuming that the ensuing frisk was permissible, Officer Edwards' questions to Mr. Griffin were unrelated to the attempted theft or the frisk for weapons. As a result, the questions became an unreasonable search when Officer Edwards continued to "probe and investigate" about the items he felt in Mr. Griffin's pocket. And because the shotgun shells were not themselves contraband or evidence of a crime, Office Edwards' further investigation—e.g., asking Mr. Griffin if he had ever been to prison—"was constitutionally invalid." The district court recognized that the simple act of police questioning does not constitute a seizure, but concluded that Officer Edwards' actions "went beyond the scope necessary to ensure his safety or the safety of those around him," and suppressed Mr. Griffin's statements and the shotgun shells as "fruits of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## II

"Because rulings on motions to suppress involve mixed questions of fact and

4

law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo.*" *United States v. Lewis*, 674 F.3d 1298, 1302-03 (11th Cir. 2012) (internal quotation marks omitted). As noted earlier, the facts here are not in dispute.

## A

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The Supreme Court has held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).   To determine the legality of an investigatory stop under the Fourth Amendment, we first ascertain whether the stop was justified at its inception. *See United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006). We then ask whether the officer's actions were reasonably related in scope to the circumstances that justified the stop in the first place. *See id*. In making these assessments, we look at "the totality of the circumstances—the whole picture[.]" *United States v. Cortez*, 449 U.S. 411, 417 (1981).

It is undisputed that the initial stop of Mr. Griffin was constitutionally

5

permissible, as Officer Edwards reasonably suspected that Mr. Griffin had tried to steal some items of clothing. Not only did the security guard describe Mr. Griffin as the perpetrator, *see, e.g.*, *Morelli v. Webster*, 552 F.3d 12, 19-20 (1st Cir. 2009) (reasonable suspicion of theft provided basis for *Terry* stop), Mr. Griffin behaved evasively and refused to obey Officer Edwards' command to stop, *see, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (nervous and evasive behavior is a relevant factor in determining reasonable suspicion, and flight, the consummate act of evasion, is suggestive of wrongdoing). We therefore move on to what transpired during the stop.

**B**

The district court assumed, without deciding, that Officer Edwards' pat-down was valid at its inception. Mr. Griffin questions this assumption, asserting that the frisk was unconstitutional because Officer Edwards did not have the required reasonable suspicion that he was armed and dangerous. The government, for its part, contends that Officer Edwards' frisk of Mr. Griffin was justified. The government, we think, has the better of the argument.

Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened. *See, e.g.*, *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010).

6

Mr. Griffin relies on the district court's findings that "there [was] no evidence that would suggest [Mr. Griffin] '[was] armed and presently dangerous,'" and no evidence that Mr. Griffin "threatened to use a weapon or used a weapon in the alleged execution of the petit theft." But *Terry* does not demand definitive evidence of a weapon or absolute certainty that an individual is armed. The process of evaluating whether reasonable suspicion exists under *Terry* "does not deal with hard certainties, but with probabilities." *Cortez*, 449 U.S. at 418. "'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *White*, 593 F.3d at 1202-03 (quoting *Terry*, 392 U.S. at 27).

When evaluating the totality of the circumstances, we do not consider each fact in isolation, *see United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002), and here we conclude that the facts known by Officer Edwards at the time permitted him to frisk Mr. Griffin consistent with the Fourth Amendment. First, Officer Edwards was alone at night in a high crime area, and had not been told anything specific about Mr. Griffin, other than that he had tried to steal some items of clothing. Second, Mr. Griffin—who was in the vicinity of six to eight other persons—acted evasively and refused to obey Officer Edwards' command that he stop. Third, Officer Edwards had not finished investigating the alleged attempted theft. *See United States v. Moore*, 817

7

F.2d 1105, 1108 (4th Cir. 1987) ("The circumstances surrounding the stop support the officer's belief that a further frisk for weapons was warranted. The hour was late, the street was dark, the officer was alone, and the suspected crime was burglary, a felony that often involves the use of weapons."). *See also Hunter*, 291 F.3d at 1306-07 (officer could conduct frisk under *Terry* where encounter took place in a high crime area, individual who was seen observing illegal gambling walked away quickly when the police approached, and officer saw bulge in individual's waistband); *United States v. Aldridge*, 719 F.2d 368, 372 (11th Cir. 1983) ("Having made a valid investigative stop of a vehicle containing three men in a poorly lit area in the middle of the night pursuant to a radio report that the suspects may have been involved in criminal activity [i.e., tampering with a vehicle], [the officer] was entitled to take reasonable measures to neutralize the threat of physical harm."). The Eighth Circuit has noted, in upholding a frisk for weapons of a person suspected of stealing a bicycle, that "it is not inconceivable" for a police officer to believe that a "thief possessed a weapon," *United States v. Banks*, 553 F.3d 1101, 1106 (8th Cir. 2009), and other circuits have held that individuals reasonably suspected of burglary and theft can be frisked for weapons under *Terry* because of the nature of those offenses. *See United States v. Snow*, 656 F.3d 498, 501 (7th Cir. 2011) ("Because burglary is the type of offense 'normally and reasonably expected to involve a weapon,' . . .

police do not require additional information suggesting that a suspect might be armed before they may conduct a protective frisk of someone they reasonably suspect of being a burglar.") (quoting *United States v. Barnett*, 505 F.3d 637, 640-41 (7th Cir. 2007)); *United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007) ("Like burglary, car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize police officer safety, and thus justifies a protective frisk under *Terry* to ensure officer safety.").

We need not decide today whether to adopt such a categorical *Terry* rule. It is sufficient to hold that the suspected offense, together with the attendant circumstances, provided a sufficient basis for Officer Edwards to frisk Mr. Griffin. "Great deference is given to the judgment of trained law enforcement officers 'on the scene[,]'" *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003), and Officer Edwards testified that he conducted the frisk to ensure his own safety because he believed Mr. Griffin "had just committed a criminal act" and "was the individual [he] needed to make contact with." *See* R2:10. In our view, Officer Edwards' frisk was consistent with *Terry* and its progeny. *Cf. Terry*, 392 U.S. at 23 ("American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.").

**C**

The district court noted that the simple act of police questioning does not generally constitute a seizure. But it concluded that the encounter turned into an unreasonable search at the point when Officer Edwards "probe[d] and investigate[d]" about the non-contraband items he felt in Mr. Griffin's back pocket. As the district court saw it, Officer Edwards' questions were not reasonably related in scope to the circumstances that justified the stop in the first place. Officer Edwards did not believe that the objects in the pocket were weapons, and even if he had believed that the objects were shotgun shells, the shells were not, in and of themselves, weapons, contraband, or evidence of a crime. The questions, moreover, were "completely unrelated to the only suspicions" that Officer Edwards had concerning Mr. Griffin at the time (i.e., that Mr. Griffin had tried to steal some items of clothing and/or was armed). "The issue presented," said the district court, was "not the scope of the detention, but rather the scope of the search."

The district court relied on cases holding that the scope of a *Terry* stop must be reasonably related to the reasons justifying the detention. *See, e.g.*, *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) ("To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be justified at its inception, and reasonably related in scope

10

to the circumstances which justified the interference in the first place.") (internal quotation marks and ellipsis omitted). We do not take issue with this general principle, but it does not control here.

The Supreme Court has "'held repeatedly that mere police questioning does not constitute a seizure.'" *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (citation omitted). For example, in *Mena* the Supreme Court did not find any constitutional infirmity in an INS officer questioning a person about her immigration status while she was detained during the execution of a search warrant—by other law enforcement officers—for deadly weapons and evidence of gang membership. The Court explained that the questioning did not "constitute[ ] a discrete Fourth Amendment event," and as long as the queries did not prolong the detention, "the officers did not need reasonable suspicion to ask [the person] for her . . . immigration status." *See id.* Four years after *Mena*, the Court held, in a case involving a traffic stop, that "[a]n officer's inquiries into matters unrelated to the justification for the . . . stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

So how do cases like *Mena* and *Johnson* affect, if at all, the "reasonably related

11

in scope" prong of *Terry*? This is a matter of first impression for us,[2] but a number of

our sister circuits have directly confronted the question, and they have all answered

it the same way. *See United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011)

("Both *Mena* and *Johnson* make clear that unrelated questioning during an

investigative stop . . . does not run afoul of the scope component of *Terry*'s second

prong."); *United States v. Everett*, 601 F.3d 484, 494 n.10 (6th Cir. 2010) ("[*Mena*]

---

[2] In *United States v. Purcell*, 236 F.3d 1274, 1279-80 (11th Cir. 2001), decided before *Mena* and *Johnson*, we noted that under then-existing Fifth Circuit precedent "the issue regarding 'unrelated' questions concerns not the content of the questions, but their impact on the duration of the stop[.]" We also acknowledged that the Tenth Circuit had taken a more restrictive approach, holding that unrelated questions could be asked during a traffic stop only if there was independent reasonable suspicion for them. *See id.* at 1279. We concluded that the questions asked by the officer during the traffic stop at issue were appropriate under either approach, without ever expressly adopting one over the other. *See id.* at 1280 ("We have concluded that, under either of these tests, Deputy Warren's question about guns or drugs was permissible.").

In a 2005 case involving a traffic stop for speeding and questions by the officer about the purpose of the trip, we cited *Mena* for the proposition that, where an officer asks questions unrelated to the reason for the stop or officer safety, "we are to look only at the duration of the seizure given all the circumstances[.]" *United States v. Hernandez*, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005). But that statement was dicta because we concluded that the officer, from the outset of the stop, had independent reasonable  suspicion to ask the driver and passenger unrelated questions about the purpose of their trip. *See id.* at 1210 ("From the first minute of the stop, the driver and Defendant demonstrated suspicion that could warrant an objectively reasonable policeman to believe that Defendant might be involved in other criminal activity.").

Two years later, in yet another traffic stop case, we cited *Hernandez* for the proposition  that "we do not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the duration of the detention was prolonged for an unreasonable time." *United States v. Ramirez*, 476 F.3d 1231, 1237 n.11 (11th Cir. 2007) (internal quotation marks omitted). But this statement too was dicta, as we found no need to address the stated principle. *See id.* ("Here, because we conclude that Ramirez was not 'detained' at all for purposes of the Fourth Amendment at the time Corporal Martin asked further questions of him, we need not address whether the alleged extension of the duration of the traffic stop was reasonable or unreasonable under *Hernandez*.").

12

and *Johnson* . . . stand for the proposition that mere questioning—on any subject—cannot violate the scope prong of *Terry*[,]" and "[t]herefore, where *Terry*'s duration prong is not at issue . . . the subject of the questioning" is irrelevant); *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (*Mena* overruled cases holding that unrelated questions during a *Terry* stop must be supported by independent reasonable suspicion); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006) (*Mena* "limited" the "reasonably related in scope" prong of *Terry* so that, as long as the unrelated questioning does not extend the length of the detention, "there is no Fourth Amendment issue with respect to the content of the questions"). *See also United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (*en banc*) ("questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable or require suppression of evidence found as a result of the answers"). We concur with the Fourth, Sixth, Seventh, Ninth, and Tenth Circuits, and hold—consistent with *Mena* and *Johnson*—that unrelated questions posed during a valid *Terry* stop do not create a Fourth Amendment problem unless they "measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. This is because such questions, absent a prolonged detention, do not constitute a "discrete Fourth Amendment event." *Mena*, 544 U.S. at 101.

13

Like our sister circuits, we do not think it is appropriate—given the language in *Mena* and *Johnson*—"to adopt a bright-line 'no prolongation' rule." *See Everett*, 601 F.3d at 492 (citing cases in accord from the First, Second, Eighth, Ninth, and Tenth Circuits). The issue, therefore, is whether the time it took Officer Edwards to ask the two questions, and for Mr. Griffin to answer them, "measurably" extended or prolonged the duration of the stop so as to make it unreasonable under the Fourth Amendment. To address this issue, we do not simply look at the "interval of prolongation in isolation," but rather assess the length of the stop as a whole, including any extension of the encounter, by undertaking a fact-bound, context-dependent analysis of all of the circumstances concerning the stop and the unrelated questions. *See Digiovanni*, 650 F.3d at 509; *Everett*, 601 F.3d at 493-94.

The district court did not make any specific findings about whether Officer Edwards' questioning prolonged the stop, measurably or not, probably because it did not think the critical issue was the scope of the detention. But given the district court's description of the encounter, the brevity of the questions and the answers, and the fact that Mr. Griffin makes no claim of an unconstitutional temporal extension of the stop, we cannot believe that the exchange lasted more than 30 seconds. Because Officer Edwards had not yet completed his investigation into the alleged attempted theft, and because he acted diligently, his brief questions did not transform the stop

14

into an unconstitutionally prolonged seizure. *See United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010) (questions about travel plans, which were unrelated to reason for traffic stop, and which took an additional one to two minutes, did not unreasonably lengthen stop and therefore did not violate the Fourth Amendment); *Everett*, 601 F.3d at 495-96 (officer's single unrelated question during traffic stop about weapons and narcotics, which took up several seconds, "did not render the traffic stop an unreasonable seizure under the Fourth Amendment"—case "not remotely close").

## D

To the extent that it believed that Officer Edwards' questions constituted a search under the Fourth Amendment, the district court was mistaken. Whatever else they might be, questions posed by a police officer to a suspect about what he has in his pocket and whether he has been to prison are not, in the Fourth Amendment sense, a search. "In context, these sorts of questions are not the verbal equivalent of reaching into a suspect's pockets to remove the contents, or the same as ordering a suspect to 'empty his pockets' in the midst of a protective frisk." *United States v. Street*, 614 F.3d 228, 234 (6th Cir. 2010) (internal citations omitted). *See also Childs*, 277 F.3d at 954 ("Nor do the questions forcibly invade any privacy interest or extract information without the suspect's consent."). "Sometimes a question is just a

15

question—and an eminently reasonable question at that. That is all that happened here." *Street*, 614 F.3d at 234.

### E

Mr. Griffin, relying on *Minnesota v. Dickerson*, 508 U.S. 366 (1993), also argues the frisk went beyond what *Terry* permits. We disagree.

In *Dickerson*, a police officer conducting a frisk for weapons felt a lump in the person's front pocket. Although the officer had not found any weapons during the frisk, and knew the lump in the pocket was not a weapon, he squeezed and manipulated the lump with his fingers from the outside of the pocket to determine what it was. He concluded that the lump was cocaine wrapped in cellophane, and reached inside the pocket and pulled out a small plastic bag with cocaine. *See id.* at 369. The Supreme Court concluded that the Minnesota Supreme Court had correctly suppressed the cocaine because the officer went beyond what *Terry* allows: "Here, the officer's continued exploration of [the] pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under *Terry*:] . . . the protection of the police office and others nearby.' It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize[.]" *Id.* at 378 (alterations in original) (quoting *Terry*, 392 U.S. at 29).

16

Officer Edwards testified at the suppression hearing that, during the pat-down, he "r[a]n [his] hand across" Mr. Griffin's back left pocket and felt what he thought were C-cell batteries. *See* R2:10, 29-31. When he was asked directly if he "kind of kneed [sic] the pocket, trying to figure out what was inside," Officer Edwards answered no. *See* R2:33. And the district court found that Officer Edwards "did not reach into the . . . pocket to examine the objects closer, but rather asked [Mr. Griffin] why he was carrying batteries."

On the record before us, Mr. Griffin has not made out a *Dickerson* violation. A frisk necessarily entails the officer's use of his hands to feel for weapons, and nothing that Officer Edwards did physically violated Mr. Griffin's Fourth Amendment rights. *See Dickerson*, 508 U.S. at 375 ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass make its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons[.]").

Mr. Griffin's real objection, we think, is to the questions that Officer Edwards asked during the frisk.  But those questions, as explained above, did not transgress the Fourth Amendment. Contrary to Mr. Griffin's argument, *Dickerson* does not preclude an officer from asking about objects which he knows are not weapons. *See, e.g.*, *United States v. Rivers*, 121  F.3d 1043, 1046-47 (7th Cir. 1997) (officer did not

17

violate *Dickerson* by "linger[ing] not more than one to two seconds" on lump in pocket, and then tapping lump "again a few times" when asking person what the lump was).  The cases Mr. Griffin cites in support of his argument, moreover, are distinguishable or not persuasive.

In *United States v. Perez*, 408 Fed. App'x 198, 200-02 (10th Cir. 2011), the Tenth Circuit affirmed a suppression order because the officer, after completing his frisk for weapons, continued to pat the defendant's right rear pocket, slid his hand in that area to try to identify an object he felt, and then asked the defendant what the object was. That factual scenario is not present here. Officer Edwards did not conduct a second frisk after completing the first, and he did not improperly manipulate Mr. Griffin's back left pocket.

The district court in *United States v. Lemons*, 153 F.Supp.2d 948, 958-59 (E.D. Wisc. 2001), did hold that a police officer "committed a *Dickerson* violation when he questioned [the suspect] about the items in [his] pocket." *Lemons* does not sway us, however, because it relied on a Seventh Circuit panel opinion that was later rejected by the Seventh Circuit sitting *en banc, see Childs*, 277 F.3d at 949 (rejecting view of the panel in *United States v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001)), and because it was decided before *Mena* and *Johnson*.

**III**

18

The district court's order granting Mr. Griffin's motion to suppress is reversed,

and the case is remanded for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**