[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10396

_____

D.C. Docket No. 1:13-cr-20630-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CALVIN MATCHETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 21, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by
designation.

This appeal presents an issue of first impression for this Court: whether the vagueness doctrine of the Due Process Clause of the Fifth Amendment applies to the advisory Sentencing Guidelines. Calvin Matchett pleaded guilty to being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and now challenges both the denial of his motion to suppress the firearm and the calculation of his sentence. Police Officer Jesse Smith stopped Matchett when he saw Matchett carrying a flat-screen television in a residential neighborhood on a weekday morning. After speaking with Matchett, Officer Smith frisked him based on his confrontational demeanor and the risk that he had a burglary tool that could be used as a weapon. When Officer Smith found a loaded handgun in Matchett's pocket, Matchett fought with Officer Smith for over three minutes in an attempt to flee. The district court did not err when it denied Matchett's motion to suppress. It also correctly determined that Matchett's previous convictions for burglary of an unoccupied dwelling were crimes of violence and that Matchett's resistance created a substantial risk of death or bodily injury in the course of fleeing from a law enforcement officer. We reject Matchett's argument that the definition of "crime of violence" in the Sentencing Guidelines is unconstitutionally vague in light of *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015). The vagueness doctrine applies only to laws that prohibit conduct and fix punishments, not advisory guidelines. We affirm.

2

## I. BACKGROUND

At approximately 9:00 a.m. on Tuesday, April 30, 2013, Police Officer Jesse Smith observed Matchett "carrying an unboxed, large flat screen television" down a residential street in the Bunche Park area of Miami Gardens, Florida. Officer Smith parked his marked police vehicle about twenty feet behind Matchett and turned on the blue lights. Officer Smith walked toward Matchett, identified himself, and told Matchett that he was not in any trouble. Officer Smith informed Matchett that he thought it was "kind of odd" to walk down the sidewalk in the morning carrying an unboxed television. After Matchett explained that he was carrying the television to a friend's house around the corner, Officer Smith asked Matchett to produce identification in case someone later reported the television as stolen.

Officer Smith testified that when Matchett put down the television, his demeanor changed immediately. Matchett "went from non-confrontational [to] almost like he was scared." Matchett's "eyes got wider," he was "tense," and he was "looking to his right and looking to his left as if [he was] about to run." Officer Smith had seen "this look hundreds and hundreds of times in [his] career," and he thought Matchett had a reason to run.

Officer Smith was concerned that Matchett might have had a burglary tool such as "a screwdriver, a pry bar, a knife, [or] anything of that nature" that could

3

be used as a weapon and could be concealed in the pockets of his baggy jeans. Matchett "patt[ed] the outside of his pockets" pretending to look for identification, but did "not dig[] into them to look." Officer Smith noticed that Matchett "patted his right rear pocket, his left front pocket, and his left rear pocket, but never touched his right front pocket, which . . . heightened [Officer Smith's] awareness" that Matchett might have a weapon.

Officer Smith "stepped up" to Matchett, "grabbed him by his waistband," and said, "You're not under arrest. Don't move." Officer Smith patted him down and felt a handgun in Matchett's front right pocket. Officer Smith held onto the gun and asked Matchett why he had it. Matchett then "physically pulled away from [Officer Smith] and tried to run away."

Officer Smith grabbed Matchett with one hand on the waistband and the other on the gun and "had to throw him back into [a] fence to keep ahold of him." Officer Smith described the scuffle as "a wrestling match" and noted that Matchett "almost slipped away." The struggle lasted for "[w]ell over three minutes," and several cars and one pedestrian stopped to watch. Officer Smith suffered "lots of abrasions and scrapes," and both of his knees were bloodied. Officer Smith eventually pinned Matchett to the ground and held him there until another officer arrived. "At the end of the struggle, [the gun] was found . . . about ten feet away from [Officer Smith and Matchett] on the sidewalk." The gun was loaded.

4

After a grand jury indicted Matchett on one count of possession of a firearm and ammunition by a convicted felon, 18 U.S.C. § 922(g)(1), he moved to suppress the handgun. Matchett argued that Officer Smith illegally stopped and frisked him in violation of the Fourth Amendment because Officer Smith lacked reasonable suspicion to believe that criminal activity was afoot or that Matchett had a weapon. A magistrate judge issued a report and recommendation concluding that Officer Smith had reasonable suspicion to stop and frisk Matchett. The magistrate judge also found that Matchett's demeanor, coupled with the likelihood that a burglar might have a weapon or tool that could be used as a weapon, gave rise to a reasonable suspicion that Matchett was armed and posed a risk to Officer Smith's safety. The district court adopted the magistrate judge's report and recommendation and denied Matchett's motion to suppress. Matchett then pleaded guilty, but he reserved his right to appeal the denial of his motion to suppress.

The presentence investigation report calculated a base offense level of 24 with a criminal history category of 4 and a guideline range of 77 to 96 months of imprisonment. The calculated range included an enhancement for Matchett's two prior felony convictions for "crime[s] of violence," United States Sentencing Guidelines Manual § 2K2.1(a)(2) (Nov. 2014), and a two-level enhancement for "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," U.S.S.G. § 3C1.2.

5

At sentencing, Matchett objected to both of these enhancements. He argued that his prior felony convictions for burglary of an unoccupied dwelling, Fla. Stat. § 810.02(1)(b), (3)(b), were not "crime[s] of violence." He also argued that he neither attempted to flee nor recklessly endangered anyone.

The district court ruled that the presentence investigation report correctly calculated Matchett's offense level. It also determined that burglary of an unoccupied dwelling is a "crime of violence" under the guidelines. U.S.S.G. § 2K2.1(a)(2). The district court found that Matchett "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer" under section 3C1.2 of the guidelines because Matchett had "in fact, caus[ed] injury" to Officer Smith—abrasions, scrapes, and bloodied knees—and "pos[ed] a substantial risk of even death or serious bodily injury by his continued resistance and his access to a loaded firearm." The district court sentenced Matchett to 96 months of imprisonment.

## II. STANDARDS OF REVIEW

"The grant or denial of a motion to suppress evidence is reviewed in this Court as a mixed question of law and fact. We assess the district court's findings of fact under the clearly erroneous standard and review the application of the law to the facts *de novo*." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (citation omitted). "The facts are construed in favor of the party that prevailed" in

6

the district court. *Id.* "[W]e may affirm the denial of a motion to suppress on any ground supported by the record." *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010).

"The district court's factual findings are reviewed for clear error, and its application of those facts to justify a sentencing enhancement is reviewed de novo." *United States v. Creel*, 783 F.3d 1357, 1359 (11th Cir. 2015) (quoting *United States v. Spriggs*, 666 F.3d 1284, 1286 (11th Cir. 2012)) (internal quotation marks omitted). We review constitutional challenges to the sentencing guidelines *de novo*. *United States v. Pressley*, 345 F.3d 1205, 1209 (11th Cir. 2003). "For a factual finding to be clearly erroneous, this [C]ourt, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed." *Creel*, 783 F.3d at 1359 (quoting *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004)) (alteration in original) (internal quotation marks omitted). We may affirm a sentencing enhancement "for any reason supported by the record, even if not relied upon by the district court." *United States v. Chitwood*, 676 F.3d 971, 975 (11th Cir. 2012) (quoting *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008)) (internal quotation marks omitted).

### III. DISCUSSION

We divide our discussion into two parts. First, we explain that the district court did not err in denying Matchett's motion to suppress. Next, we explain that

7

advisory guidelines cannot be unconstitutionally vague, and that the district court did not err in applying the two sentencing enhancements, U.S.S.G. §§ 2K2.1(a)(2), 3C1.2.

   *A. The District Court Did Not Err in Denying Matchett's Motion to Suppress*.

   Matchett argues that Officer Smith stopped and frisked him in violation of the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. We have identified "three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). "[T]he first category of consensual encounters does not implicate [F]ourth [A]mendment scrutiny," but the second category requires "reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Id.* (quoting *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986)) (second and third alterations in original). "Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened." *United States v. Griffin*, 696 F.3d 1354, 1359 (11th Cir. 2012).

We assume without deciding that Officer Smith seized Matchett at the onset of the encounter for purposes of the Fourth Amendment. We first address the stop and then address the frisk. We hold that Officer Smith had reasonable grounds for both and did not violate the Fourth Amendment.

1. Officer Smith Had Reasonable Suspicion to Stop and Question Matchett.

To stop Matchett and question him, Officer Smith needed "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884 (1968)). To determine whether reasonable suspicion exists, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002)) (internal quotation marks omitted). We view the totality of the circumstances in the light of the officer's special training and experience because "behavior, seemingly innocuous to the ordinary citizen, may 'appear suspect to one familiar with [criminal] practices.'" *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (quoting *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992)).

9

We agree with the district court that Officer Smith had reasonable suspicion to stop Matchett and question him. Officer Smith observed Matchett walking down a residential street carrying an unboxed flat-screen television around 9 a.m. on a weekday. Officer Smith knew from his experience that residential burglaries often occurred during the day while homeowners were at work, that flat-screen televisions were commonly stolen during residential burglaries, and that residential burglaries were common in Bunche Park. Although Officer Smith did not observe any illegal activity, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). When conduct is susceptible to both an innocent and a suspicious explanation, an "officer[] [can] detain the individual[] to resolve the ambiguity." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 677 (2000). Based on the totality of the circumstances, Officer Smith had a reasonable, articulable suspicion to stop Matchett and question him.

2. Officer Smith Reasonably Believed that His Safety Was in Danger.

To frisk Matchett, Officer Smith needed a "reasonabl[e] belie[f] that his safety, or the safety of others, [was] threatened." *Griffin*, 696 F.3d at 1359. This objective inquiry is similar to our analysis of reasonable suspicion. That is, we "evaluat[e] the totality of the circumstances" instead of "each fact in isolation." *Id.*

10

We agree with the district court that when Matchett's demeanor changed, Officer Smith was entitled to frisk him for weapons. After Officer Smith asked Matchett to produce his identification, his "muscles . . . tensed," his "eyes got wider," and he looked "scared." He was "looking left and right as if he was going to flee." Matchett wore baggy jeans that easily could conceal a weapon. He patted the outside of his pockets as if looking for identification but made no attempt to search inside of his pockets. Officer Smith noticed that Matchett "never touched his right front pocket" when searching for his identification. Officer Smith also knew from experience that burglars frequently have tools that can be used as weapons such as a "screwdriver, a pry bar, [or] a knife." "[O]ther circuits have held that individuals reasonably suspected of burglary . . . can be frisked for weapons under *Terry* because of the nature of th[e] offense[]." *Id*. Officer Smith was alone during the encounter, which bolstered his reasonable concern for his safety. *See id.* (considering the fact that the officer was alone when holding that the officer had a reasonable belief that his safety was in danger). Based on the totality of the circumstances, Officer Smith had reasonable grounds to frisk Matchett. Because Officer Smith did not violate the Fourth Amendment when he stopped and frisked Matchett, we affirm the denial of Matchett's motion to suppress.

11

*B. The Sentencing Court Correctly Applied the Sentencing Guidelines.*

Matchett challenges two enhancements of his sentence. He argues that the residual clause of the career-offender guideline is unconstitutionally vague and, alternatively, that his previous convictions for burglary of an unoccupied dwelling are not crimes of violence. He also argues that the district court erred when it enhanced his sentence for reckless endangerment during flight. We address each enhancement in turn.

1. The District Court Did Not Err in Classifying Burglary of an Unoccupied Dwelling as a Crime of Violence Under the Guidelines.

A defendant convicted of unlawful possession of a firearm receives an enhanced base offense level of 24 if he "committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2). The definition of "crime of violence" includes "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). The district court determined that Matchett's two prior convictions for burglary of an unoccupied dwelling, Fla. Stat. § 810.02(1)(b), (3)(b), were "crime[s] of violence" because they "involve[d] conduct that presents a serious potential risk of physical injury to another," U.S.S.G. § 4B1.2(a)(2).

12

Matchett argues that the residual clause of section 4B1.2(a)(2), which defines as crimes of violence offenses that "otherwise involve[] conduct that presents a serious potential risk of physical injury to another," *id.*, is unconstitutionally vague in the light of *Johnson* and, alternatively, that burglary of an unoccupied dwelling does not fall under its terms. We reject both arguments. We affirm the imposition of the enhanced base offense level by the district court.

  a. <u>The Vagueness Doctrine Does Not Apply to Advisory Sentencing Guidelines.</u>

In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act is unconstitutionally vague. The Armed Career Criminal Act increases sentences for certain offenders who have three previous convictions for violent felonies or serious drug offenses. 18 U.S.C. § 924(e)(1). The definition of "violent felony" under the Act is nearly identical to the definition of "crime of violence" under the guidelines, and both definitions include an identical residual clause that encapsulates crimes that "present[] a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B); U.S.S.G. § 4B1.2(a)(2). Matchett argues, and the government agrees, that because we interpret the residual clause of section 4B1.2(a) of the advisory guidelines in the same manner as we interpret the residual clause of the Armed Career Criminal Act, *see Gilbert v. United States*, 640 F.3d 1293, 1309 n.16 (11th Cir. 2011) (en banc), the residual clause of section 4B1.2(a) is also unconstitutionally vague. But "[c]onfessions of error . . . do not

13

'relieve this Court of the performance of the judicial function.'" *Sibron v. New York*, 392 U.S. 40, 58, 88 S. Ct. 1889, 1900 (1968) (quoting *Young v. United States*, 315 U.S. 257, 258, 62 S. Ct. 510, 511 (1942)). "[O]ur judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." *Id.* (quoting *Young*, 315 U.S. at 259, 62 S. Ct. at 511) (internal quotation marks omitted). Instead, this Court must decide for itself whether the residual clause of section 4B1.2(a)(2) of the Guidelines is unconstitutionally vague.

By its terms, the decision of the Supreme Court in *Johnson* is limited to criminal statutes that define elements of a crime or fix punishments. The Supreme Court held that the residual clause of the Armed Career Criminal Act "violate[d] the Constitution's guarantee of due process," 135 S. Ct. at 2563, because it violated "[t]he prohibition of vagueness in criminal statutes," *id.* at 2556–57. It further explained that the vagueness doctrine "appl[ies] not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Id* at 2557. The Armed Career Criminal Act defines a crime and fixes a sentence, *see* 18 U.S.C. § 924(e), but the advisory guidelines do neither.

The Sentencing Guidelines are merely "the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007), designed to "assist . . . the sentencing judge" in determining a sentence, *United*

14

*States v. Tichenor*, 683 F.3d 358, 364 (7th Cir. 2012) (quoting *United States v.*

*Brierton*, 165 F.3d 1133, 1139 (7th Cir. 1999)). In the end, a sentencing judge

"must make an individualized assessment based on the facts presented" and "may

not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50, 128

S. Ct. at 596–97. "The sentencing judge's authority to exercise discretion

distinguishes the Guidelines from criminal statutes in a significant and undeniable

manner." *Tichenor*, 683 F.3d at 365.

The vagueness doctrine, which "rest[s] on [a] lack of notice," *Maynard v.*

*Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 1857 (1988), does not apply to

advisory guidelines. The Supreme Court has explained that "[a]ny expectation

subject to due process protection . . . that a criminal defendant would receive a

sentence within the presumptively applicable guideline range did not survive [the]

decision in *United States v. Booker*." *Irizarry v. United States*, 553 U.S. 708, 713,

128 S. Ct. 2198, 2202 (2008). Another circuit has already held that "[s]ince the

Guidelines are merely advisory, defendants cannot rely on them to communicate

the sentence that the district court will impose. Defendants' inability to look to the

Guidelines for notice underscores why . . . they cannot bring vagueness challenges

against the Guidelines." *Tichenor*, 683 F.3d at 365 (footnote omitted).

"Because there is no constitutional right to sentencing guidelines—or, more

generally, to a less discretionary application of sentences than that permitted prior

15

to the Guidelines—the limitations the Guidelines place on a judge's discretion cannot violate a defendant's right to due process by reason of being vague." *United States v. Wivell*, 893 F.2d 156, 160 (8th Cir. 1990). Before Congress enacted the Guidelines, "the Federal Government and the States employed indeterminate-sentencing schemes in which judges and executive branch officials (*e.g.*, parole board officials) had substantial discretion to determine the actual length of a defendant's sentence." *Apprendi v. New Jersey*, 530 U.S. 466, 549, 120 S. Ct. 2348, 2394 (2000) (O'Connor, J. dissenting). Outside of the death-penalty context, this plenary-discretion regime did not violate the notice requirement of the Due Process Clause. *See Lockett v. Ohio*, 438 U.S. 586, 602–04, 98 S. Ct. 2954, 2963–65 (1978); *see also Wivell*, 893 F.2d at 159–60. For that reason, advisory guidelines that inform a sentencing judge's discretion also cannot violate the notice requirement.

Matchett argues that because this Court has entertained vagueness challenges to the guidelines in the past, we have implicitly held that the guidelines are subject to a challenge for vagueness, but we disagree. A "holding is comprised both of the result of the case and 'those portions of the opinion necessary to that result by which we are bound.'" *Powell v. Thomas*, 643 F.3d 1300, 1305 (11th Cir. 2011) (quoting *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009)). That the guidelines can be void for vagueness is not a necessary condition for

16

rejecting a vagueness challenge on other grounds. For example, in *United States v. Travis* we rejected a challenge to section 4B1.2(a)(2) because Supreme Court and Circuit precedent foreclosed an argument that the text of the residual clause was unconstitutionally vague. *See* 747 F.3d 1312, 1314 n.1 (11th Cir. 2014). Instead of deciding whether the guidelines could be void for vagueness, we summarily disposed of the vagueness challenge in a footnote as foreclosed by binding precedent. *See id.* But we did not decide that advisory sentencing guidelines can be unconstitutionally vague.

We also reject Matchett's argument that because the Ex Post Facto Clause applies to the advisory guidelines, the vagueness doctrine of the Due Process Clause must also apply to them. The Supreme Court has articulated different tests to determine when these doctrines apply. The Ex Post Facto Clause, among other things, governs laws that "present[] a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Peugh v. United States*, __ U.S. __, 133 S. Ct. 2072, 2082 (2013) (quoting *Garner v. Jones*, 529 U.S. 244, 250, 120 S. Ct. 1362, 1367 (2000)). Because increasing a guideline range carries a sufficient risk of a higher sentence, the Ex Post Facto Clause applies to the advisory guidelines. *Id.* at 2084. But the Due Process Clause governs laws that define offenses and fix punishments. Whether the Ex Post Facto Clause applies to the advisory guidelines in no way informs our analysis.

17

We reject Matchett's policy concern that allowing the residual clause of section 4B1.2(a)(2) to stand will upend the sentencing process by forcing courts to apply a clause that, according to *Johnson*, lacks precise meaning. This argument is beyond the scope of our review and unpersuasive. Although *Johnson* abrogated the previous decisions of the Supreme Court interpreting the residual clause of the Armed Career Criminal Act, sentencing courts interpreting the residual clause of the guidelines must still adhere to the reasoning of cases interpreting the nearly identical language in the Act. His policy concern is properly addressed to the United States Sentencing Commission, which has proposed eliminating the residual clause from section 4B1.2(a)(2) "as a matter of policy." News Release, U.S. Sentencing Comm'n, *U.S. Sentencing Commission Seeks Comment on Revisions to Definition of Crime of Violence* 1 (Aug. 7, 2015).

Holding that advisory guidelines can be void for vagueness, by contrast, would upend our sentencing regime. The Sentencing Guidelines are an important tool to guide judges' discretion in sentencing, and many of their provisions could be described as vague. For example, the guidelines impose a two-level enhancement when certain offenses "involved sophisticated means." *See* U.S.S.G. § 2B1.1(b)(10). The commentary defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9. Likewise, the Sentencing

Guidelines impose a two-level decrease if the defendant was a "minor participant." U.S.S.G. § 3B1.2(b). A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5. Holding that advisory guidelines can be unconstitutionally vague would invite more, not less, instability.

No circuit has held in a published opinion that advisory guidelines can be unconstitutionally vague. Only the Ninth Circuit has stated, in dicta, that Sentencing Guidelines can be void for vagueness, but that decision was issued when the guidelines were still mandatory. *See United States v. Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997). The Courts of Appeals for the Fifth, Sixth, Seventh, and Eighth Circuits all have held that the Sentencing Guidelines—whether mandatory or advisory—cannot be unconstitutionally vague. *See United States v. Pearson*, 910 F.2d 221, 223 (5th Cir. 1990) ("Due process does not mandate . . . notice . . . of where, within the statutory range, the guideline sentence will fall."); *United States v. Smith*, 73 F.3d 1414, 1418 (6th Cir. 1996) ("[T]he Sentencing Guidelines are not subject to a vagueness challenge."); *Tichenor*, 683 F.3d at 365 ("Our determination that the Guidelines are not susceptible to vagueness challenges has only been bolstered as a result of *Booker*."); *Wivell*, 893 F.2d at 160 ("[T]he limitations the Guidelines place on a judge's discretion cannot violate a defendant's right to due process by reason of being vague."). We join them insofar

19

as we reject Matchett's argument that advisory guidelines can be unconstitutionally vague.

b. The Florida Offense of Burglary of an Unoccupied Dwelling is a Crime of Violence Under the Residual Clause of the Career-Offender Guideline.

Although the definition of a crime of violence specifically includes the crime of "burglary of a dwelling," U.S.S.G. § 4B1.2(a)(2), the Florida offense of burglary of an unoccupied dwelling, Fla. Stat. § 810.02(1)(b), (3)(b), does not fall under that definition. The Florida offense includes burglary of "the curtilage" of the dwelling. Fla. Stat. § 810.011(2). "[T]he inclusion of curtilage takes Florida's underlying offense of burglary outside the [federal] definition of 'generic burglary' . . . , which requires an unlawful entry into, or remaining in, 'a building or other structure.'" *James v. United States*, 550 U.S. 192, 212, 127 S. Ct. 1586, 1599 (2007) (emphasis omitted) (quoting *Taylor v. United States*, 495 U.S. 575, 598, 110 S. Ct. 2143, 2158 (1990)), *overruled in part by Johnson*, 135 S. Ct. 2551. Here, the government presented no evidence that the "charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant." *United States v. Matthews*, 466 F.3d 1271, 1275 (11th Cir. 2006) (quoting *Taylor*, 495 U.S. at 602, 110 S. Ct. at 2160) (internal quotation marks omitted). Matchett's previous convictions are not burglaries of a dwelling under the guidelines.

20

The Florida offense is nevertheless a crime of violence under the residual clause of the career-offender guideline because it "involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2). For a previous conviction to be a crime of violence under the residual clause, if "the previous conviction required knowing or intentional conduct, it is enough if that conviction was for a crime that generally creates as much risk of physical injury as one of the enumerated crimes." *Chitwood*, 676 F.3d at 979. Because burglary of an unoccupied dwelling requires intentional conduct, *see* Fla. Stat. § 810.02(1)(b), (3)(b), we must decide only whether that crime "categorically pose[s] a serious potential risk of physical injury that is similar in degree to the risks posed by" the "closest analog among the enumerated offenses—burglary of a dwelling," *Chitwood*, 676 F.3d at 979. And this Court has explained that "the burglar's presence in the curtilage of [a] structure presents a serious potential risk that violence will ensue and someone will be injured." *Matthews*, 466 F.3d at 1275. Because a "burglar's presence in the curtilage of the structure presents a serious potential risk that violence will ensue and someone will be injured," *id.*, the Florida offense is a violent felony under the guidelines. *See also James*, 550 U.S. at 213, 127 S. Ct. at 1600 ("[W]e do not believe that the inclusion of curtilage so mitigates the risk presented by attempted burglary as to take the offense outside the scope of [the residual clause of the Armed Career Criminal Act].").

21

2. The District Court Did Not Err in Enhancing Matchett's Sentence for Reckless Endangerment During Flight.

Section 3C1.2 of the Sentencing Guidelines imposes a two-level enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. "Reckless" refers to "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *United States v. Wilson*, 392 F.3d 1243, 1247 (11th Cir. 2004) (quoting U.S.S.G. § 2A1.4 cmt. n.1) (internal quotation marks omitted). "In the course of fleeing" or "during flight" includes "conduct . . . in the course of resisting arrest." *United States v. Dougherty*, 754 F.3d 1353, 1359 (11th Cir. 2014). "[F]light alone is insufficient to warrant an enhancement under [section 3C1.2]." *Wilson*, 392 F.3d at 1247. The flight must be accompanied by a "substantial risk of death or serious bodily injury to others," and the defendant must "recklessly create" that risk. *Id.*

Matchett "recklessly created a substantial risk of death or serious bodily injury to another person," U.S.S.G. § 3C1.2, when he resisted arrest with a loaded handgun in his pocket. Matchett wrestled with Officer Smith for "[w]ell over three minutes," while Officer Smith "held onto the [loaded] revolver" in his pocket. Even if Matchett did not reach for the gun—the testimony is unclear—Officer

22

Smith could have unintentionally pulled the trigger during the struggle. *See, e.g.*, *United States v. Nava-Sotelo*, 354 F.3d 1202, 1203 (10th Cir. 2003) ("In an attempt to disarm [the defendant], [the corrections officer] grabbed for the gun. A struggle ensued and the firearm discharged into the ground . . . ."). The handgun also could have accidentally discharged when it fell out of Matchett's pocket. *See, e.g.*, *A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1356 (Ariz. 1995) (discussing the "many injuries from accidental discharges"); *Johnson v. Colt Indus. Operating Corp.*, 797 F.2d 1530, 1532 (10th Cir. 1986) (discussing "drop-fire[s]," in which a "gun is carried with a bullet in the chamber over which the hammer rests," and "a sharp blow to the hammer, such as when the gun is dropped and lands hammer first, will cause the gun to discharge"). This scuffle occurred in a residential area, where there were "cars and pedestrian traffic." Struggling with a police officer for three minutes in a residential neighborhood while the officer has his hand on a loaded handgun in the offender's pocket is undoubtedly reckless and creates a substantial risk of death or serious bodily harm to a third party.

Although we have not held that resisting arrest while in possession of a loaded handgun is sufficiently reckless conduct to warrant an enhancement under section 3C1.2 of the guidelines, we have held that conduct that could potentially harm a police officer or a third party is sufficiently reckless. *See, e.g.*, *Dougherty*, 754 F.3d at 1360 ("[P]oint[ing] a machine pistol at a police officer . . . f[ell] within

23

the purview of [section] 3C1.2," even though the offender did not fire the pistol.);

*United States v. Washington*, 434 F.3d 1265, 1268 (11th Cir. 2006) ("Driving a car at high speed in an area where people are likely to be found constitutes reckless disregard for others' safety," even though the offender did not collide with anyone.). Section 3C1.2 requires only that there was a substantial risk that something could have gone wrong and someone could have died or been seriously injured.

On this record, there was a significant chance that the firearm could have accidentally discharged. We hold that the district court did not err when it found that Matchett's conduct created the requisite degree of risk to justify the section 3C1.2 enhancement.

## IV. CONCLUSION

We **AFFIRM** the decision of the district court.