[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-14884

————————————————

D.C. Docket No. 2:18-cr-00168-LSC-TFM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JARODERICK HARDY,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama

————————————————

(March 17, 2020)

Before ED CARNES, Chief Judge, ROSENBAUM, and BOGGS,* Circuit Judges.

BOGGS, Circuit Judge:

---

* Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Jaroderick Hardy appeals his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), on the ground that the *Terry* stop that led to the discovery of the firearm was unconstitutional under the Fourth Amendment. We affirm.

## I

At around 1:21 a.m. on Wednesday, November 8, 2017, a resident of the Spring Valley neighborhood in Montgomery, Alabama, called 911 to report that she could hear someone outside her home. The caller reported that she had heard the same noises the previous two nights, but she did not look outside and so was unable to provide a description of what had made the noise. Montgomery Police Officer Joshua Howell arrived outside the caller's home seven minutes later, at around 1:28 a.m. At the subsequent suppression hearing, Howell testified that he understood that he was responding to a "prowler call," a common term in police parlance. After arriving outside the home, Howell patrolled the immediate area for a few minutes, but saw no one. He then began to leave the neighborhood. At around 1:35 a.m., as he was driving out of the neighborhood, Howell saw Hardy walking by himself at the intersection of Spring Valley Road and Adler Drive. The intersection is approximately 0.3 miles—or around a five-minute walk—away from the caller's home. At the time, Hardy was dressed in loose-fitting, all-black clothing, which

2

Howell knew to be common for those who commit property crimes in the neighborhood.

Howell stopped his police car, got out, and approached Hardy. Howell testified that he did this because Hardy was in the vicinity of where the 911 call had been made, it was around 1:30 a.m. on a Wednesday, and because Hardy was dressed in all black and was the only person walking in the neighborhood at the time. Howell asked Hardy where he was coming from and where he was going. Hardy said that he was heading home from the store where he had just purchased some cigarillos, which he displayed to Howell. Given his familiarity with the area, Howell knew that the nearest store to the intersection was closed at the time, and that the second nearest store, Singh's Mart, was about a mile and a half away.

Howell then told Hardy to "stand still," and asked him if he was armed. Both parties acknowledge that Hardy's interactions with Howell up to that point were consensual and that the encounter became a nonconsensual *Terry* stop only thereafter. According to Howell, Hardy was "evasive" with his answers and also said "don't shoot me" several times, which Howell said further heightened his suspicions. Although Howell later acknowledged that he did not observe any visible bulge in Hardy's clothing that would have suggested the presence of a weapon, he nevertheless proceeded to frisk Hardy, which revealed a handgun in the waistband of Hardy's pants.

3

Prior to trial, Hardy filed a motion to suppress the evidence recovered by Howell during his search. A magistrate judge then conducted an evidentiary hearing, where Howell was the only witness. Although the magistrate judge recommended that the evidence be suppressed, the district judge disagreed and denied the motion without a further hearing.[1] Hardy then pled guilty pursuant to a plea agreement that allowed him to preserve the right to appeal the order denying his motion to suppress. He was sentenced to fifteen months of imprisonment. This appeal followed.

## II.    DISCUSSION

### A. Standard of Review

We review a district court's denial of a motion to suppress as a mixed question of law and fact. *United States v. Delancy*, 502 F.3d 1297, 1304 (11th Cir. 2007). Accordingly, we review de novo the district court's application of law to facts but review its factual findings for clear error, with the facts construed in the light most favorable to the prevailing party below. *United States v. Folk*, 754 F.3d 905, 910 (11th Cir. 2014) (citation omitted).

### B. Reasonable Suspicion

---

[1] Hardy claims that it was inappropriate for the district court to decide the motion without rehearing the evidence, citing cases that suggest there is reversible error whenever the district court rejects a magistrate judge's credibility determinations without a rehearing. *See, e.g., United States v. Cofield*, 272 F.3d 1303 (11th Cir. 2001). However, the district court did not reject the magistrate judge's credibility determinations nor his factual findings. Indeed, the district court largely incorporated all of the magistrate judge's factual findings into its order. The district court merely disagreed with the magistrate judge's legal conclusions.

4

A law-enforcement officer may conduct a brief, investigatory stop of an individual if there is a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968).  Despite reasonable suspicion being a less demanding standard than probable cause, a *Terry* stop cannot be based on an officer's "inchoate and unparticularized suspicion or 'hunch.'"  *Terry*, 392 U.S. at 27; *Wardlow*, 528 U.S. at 123–24.  When evaluating reasonable suspicion, we consider the totality of the circumstances, which must be viewed in "light of the officer's special training and experience."  *United States v. Matchett*, 802 F.3d 1185, 1192 (11th Cir. 2015).  This is because "behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with [criminal] practices."  *Ibid*. (citation omitted); *see also Terry*, 392 U.S. at 27 (noting that a reasonable suspicion must be based on "the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience").

Courts have articulated specific factors that, when present, may support a finding of reasonable suspicion.  Among others, these include: presence in a high-crime area, *Wardlow*, 528 U.S. at 124; nervous or evasive behavior, *ibid*.; unprovoked flight or conspicuous avoidance of police, *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002); a visible bulge in the individual's clothes that could signify a gun, *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977);   or

5

corroboration of reports or tips to the police, *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007).  While the presence of simply one of these factors, *standing alone*, cannot serve as the basis for a *Terry* stop, reasonable suspicion is often found when more than one of these factors are present.  *See, e.g., Wardlow*, 528 U.S. at 124.

We hold that there was reasonable suspicion for a *Terry* stop and search of Hardy.  First, Officer Howell was not in the neighborhood based on a mere "hunch" but was responding to a specific type of 911 call, a "prowler" call.  Such calls were not uncommon for that area, which had a high rate of property crime.  Second, Hardy's all black clothing—while it could be innocuous—raised Howell's suspicions when observed at 1:30 a.m. on a weeknight.  According to Howell, dark clothing was something that officers dealt with daily when responding to criminal calls at nighttime.  In other words, someone who was committing or likely to commit property crimes (i.e, a "prowler") would likely be wearing all black at that time of night.  Third, Hardy was the only person that Howell encountered during his drive through the neighborhood, and he was in close proximity to the caller's house.  This, too, would have likely raised suspicions about whether he could have been responsible for the "prowler" noises that the caller had heard.  Finally, Hardy's account of how he had gone to the store to purchase cigarillos, though possible, seemed unlikely.  Evidence in the record showed that the only store open at the time

6

was a mile and a half—or a thirty-minute walk—away from the caller's house.  This meant that when Howell encountered Hardy, Hardy would have been on the tail end of an hour-long round trip to the store just to purchase a few cigarillos at 1:35 in the morning on a weeknight.  It was reasonable for Howell to have viewed Hardy's story with at least some skepticism.

All of these factors served to *increase* Officer Howell's already heightened suspicions (from the 911 call) and did little to point to Hardy's non-involvement in the purported "prowler" incident.[2]  Put differently, nearly every additional piece of information that Howell acquired during his interaction with Hardy raised further suspicions about Hardy's possible criminal activity instead of alleviating them.  The information that Howell acquired "operate[d] to distinguish" Hardy from being a normal bystander or a normal pedestrian.  *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir. 1978).[3]  Indeed, "where nothing in the initial stages of the encounter serves to dispel [an officer's] reasonable fear for his own or others' safety, he is entitled . . . to conduct a carefully limited search[.]"  *Terry*, 392 U.S. at 30.

---

[2] In support of his argument, Hardy relied heavily on an unpublished opinion.  However, it is our policy that "[u]npublished opinions are not binding precedent."  *United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013).  For that reason, we have no occasion to decide whether such unpublished cases are distinguishable or not, and we do not imply any view about the correctness of their reasoning or result.

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Importantly, even if Hardy's actions were open to innocent explanations, that does not necessarily render the *Terry* stop unconstitutional. "A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000), and "[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Wardlow*, 528 U.S. at 125. *Terry* recognized that an officer could stop a person simply "to resolve the ambiguity" created by that person's actions. *Ibid*. Officer Howell's attempts at resolving that ambiguity only served to further heighten his suspicions.

### III.   CONCLUSION

Hardy's conviction is **AFFIRMED.**