[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12377

_____

D.C. Docket No. 1:16-cr-20224-JAL-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SERGIO ANTONIO ZAMBRANO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 9, 2018)

Before ROSENBAUM, HULL, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Appellant Sergio Zambrano was charged and convicted of one count of

conspiracy to commit an offense against the United States, in violation of 18

U.S.C. § 371.  This count alleged that Zambrano and two coconspirators, Genaro Mejia and Andres Roman, conspired to (1) knowingly make false statements to firearms dealers, in violation of 18 U.S.C. § 922(a)(6); (2) knowingly and willfully export firearms outside the United States without a license, in violation of 22 U.S.C. § 2778(b)(2), (c), and 22 C.F.R. §§ 121.1(g)-(h), 127.1(a)(1); and (3) conceal and facilitate the exportation of firearms, in violation of 18 U.S.C. § 554. The conspiracy alleged that Zambrano's two codefendants bought firearms from licensed firearm dealers in the United States by means of false statements, that they disassembled the firearms, and that they concealed the barrels and other parts of the weapons in packages shipped to Colombia from South Florida.

Mejia and Roman both entered guilty pleas and were sentenced to 60 months' imprisonment, which was the statutory maximum.  Zambrano was the only defendant who proceeded to trial.  Prior to trial, however, he filed a motion to suppress evidence that he argued was obtained in violation of his Fourth Amendment rights.  The district court denied the motion to suppress, and Zambrano was ultimately convicted of the conspiracy count following a lengthy jury trial.  Like his codefendants, Zambrano received the statutory maximum sentence of five years' imprisonment following his conviction.

Zambrano now appeals his conviction, claiming that the evidence against him was insufficient to support the conspiracy conviction.  He also asserts the

2

district court erred when it denied the motion to suppress evidence.  Finally, Zambrano contends that his five-year sentence was not substantively reasonable.

After careful consideration, and with the benefit of oral argument, we affirm.

## I.    **Facts**

The facts of this case are quite lengthy, but for purposes of this opinion, we set forth a brief summary of the relevant evidence presented against Zambrano. Generally speaking, evidence showed that Zambrano purchased items that were used to conceal the shipment of firearm parts to Colombia.  Evidence also demonstrated that Zambrano, in some instances, was the individual who shipped packages containing the concealed firearms.  And, as noted more fully below, Zambrano rented a storage unit in order to hide disassembled firearms and equipment used to chop up the firearms and obliterate the serial numbers.

In August 2014, an employee at a shipping company located in South Florida discovered a package containing firearm parts, which was bound for Colombia.  The firearm parts were attached to a car grill.  The shipping company notified law enforcement, and federal agents inspected the box, finding that it contained parts of a Barrett .50-caliber sniper rifle.  The serial numbers had been obliterated from the barrel of the gun.  But there remained another number on the back of the barrel, and that permitted agents to trace the purchase of the gun.  The

3

ATF Form 4473, which reflected the sale of the rifle, revealed that Mejia had bought the firearm on July 31, 2014, at a firearms dealer in Jensen Beach, Florida.

Agents were also able to track the shipment of the package to a shipping company in Coral Springs, Florida. Video surveillance showed Zambrano shipping the package on August 1, 2014, while wearing sunglasses during the entire transaction. After agents discovered the firearm in August 2014, they contacted law-enforcement officials in Colombia to coordinate a controlled delivery of the package without the firearm.

A Colombian officer testified that he witnessed the package being delivered to a home in Colombia. After executing a search warrant on the home, police discovered various boxes with firearm parts and accessories, as well as ammunition. One box contained a telescope with firearm parts, and the receipt indicated that the telescope had been purchased at a Walmart in Coral Springs, Florida, on August 2, 2014. Another box contained a hammock along with firearm parts from a high-power .50-caliber weapon, but the serial number had been filed off. The box containing the hammock also had a label that indicated it had been shipped by someone named "Cesar Correa." After tracking down this shipment, agents viewed video surveillance showing Zambrano wearing sunglasses and carrying the hammock into the shipment store. The package was further traced back to Zambrano because, although he used a false name, he used one of his

4

former addresses. Agents also determined that Zambrano's Colombian passport listed his name as Sergio Antonio Zambrano Correa.

Based on this information, U.S. agents investigated the purchase of the parts contained in the boxes by going to the stores associated with the purchase. Video surveillance was retrieved from the date of purchase, and it revealed that Zambrano and Mejia were together at the store. Using a self-checkout register, Zambrano bought the telescope with cash. As with the telescope, agents were also able to track down the purchase of the car grill. Again, video surveillance showed Zambrano purchasing the car grill with cash on July 31, 2014. After paying for the car grill, Zambrano conducted a separate transaction for another item, this time paying with a credit card. An agent also testified that the airway bill associated with the car grill indicated that someone named "Cesar Correa" shipped the package on August 1, 2014.

Later, in mid-February 2016, Colombian authorities found a package shipped from the United States containing a .50-caliber Barrett rifle barrel and other parts attached to a cargo carrier. Again, the serial number on the barrel of the gun had been obliterated. Agents determined that the box came from a shipping company located in Margate, Florida. The owner of the shipping company testified that on February 12, 2016, Mejia had come into his store, made the

shipment using the alias "Alejandro Belalcazar," and paid in cash.[1]  The owner also indicated that Mejia had shipped heavy packages on approximately eight-to-ten other occasions, always paying in cash.  The investigation later uncovered video surveillance of Mejia purchasing the cargo carrier on February 11, 2016.

Agents were ultimately able to track down the purchaser of the .50-caliber Barrett rifle found in Colombia in February 2016.  James Smith, a licensed firearms dealer located in Tampa, Florida, testified that Zambrano's co-defendant Roman contacted him about purchasing the firearm.   According to Smith, on February 9, 2016, Roman arrived in Tampa to buy the gun.  Roman provided Smith with a completed ATF Form 4473 certifying that he was the actual purchaser, and then he left with the firearm.  A federal agent asked Smith to contact her if Roman showed interest in buying another firearm.  A few days later, Roman contacted Smith about purchasing another rifle, and Smith alerted the agent as to when Roman would arrive in Tampa.

Roman appeared at Smith's business on March 23, 2016, to complete the transaction.  At that time, he gave Smith another ATF Form 4473 and cash.  This time, however, federal agents were present and surrounded Roman as he left the business.  The individual who drove Roman to Tampa provided law enforcement

---

[1] The store owner noted that the name of the individual who made the shipment was "Belalcazar."  During trial, the owner was provided with Mejia's driver's license picture and identified him as "Belalcazar."

with text messages from her cell phone from Mejia, as well as photographs and voice messages from him. While the driver answered questions, an agent observed Roman using his cell phone at approximately 1:17 p.m. and overheard him say in Spanish, "They took it." Agents arrested Roman and seized his cell phone, which showed a call made to Mejia's phone at 1:15 p.m. Prior to Roman's arrest, agents took the rifle and told Roman that it would not be returned. Based on all of this information, agents planned to arrest Mejia the following day.

Agents conducted surveillance on Mejia's residence in the early morning hours of March 24, 2016. During briefing, the agents were shown a picture of Mejia and a separate picture of Zambrano with Mejia. They were also informed that Zambrano was thought to be an associate of Mejia's and involved in the gun trafficking; he was also suspected to be the individual who shipped weapons to Colombia in 2014. No one but Mejia was suspected of being at the house that morning, excerpt, perhaps, Mejia's girlfriend. In fact, though, Zambrano was staying there.

When Zambrano left Mejia's home, it was approximately 7:00 a.m. He exited the house, locked the door, and walked towards Mejia's BMW. Agent Edwin Lopez, who was the "eyes" of the surveillance, mistook Zambrano for Mejia and gave the other agents the signal that Mejia was present. Lopez then approached Zambrano, ordered him to stop, and called Mejia's name.

7

Lopez detained Zambrano and patted him down.  He stated he did so for officer-safety reasons, since Mejia was a known gun trafficker.  While patting Zambrano down, Lopez felt "bulky items" in his pockets.  Lopez stated that he believed the items could have been a weapon.  Based on this belief, Lopez reached inside Zambrano's pockets, retrieving the items he felt and placing them on the hood of the BMW.[2]  The items consisted of four cell phones, a wallet, and keys. As this occurred, other agents conducted a "sweep" of Mejia's residence.

At some point, Zambrano told Lopez that he was not Mejia and that his name was Zambrano.  Lopez was familiar with Zambrano's association with Mejia and the fact that he was suspected of shipping guns in 2014.

Following the sweep of Mejia's residence, Agent Hector Quintana approached Zambrano, who was still standing by the BMW.  According to Quintana, he asked Zambrano if the items located on the hood of the BMW were his property, and Zambrano replied, "yes."  Quintana then asked Zambrano in Spanish "Do you mind if I look through it?"  Zambrano responded, "Yes, sure," which he understood to mean that Zambrano consented.  Zambrano was not

---

[2] Agent Lopez's testimony during the motion-to-suppress hearing was as follows:

Q:  But did you think it could have been a weapon?

A:  Yes, Sir.

Q: And is that the reason why you pulled the items out of the pockets?

A: Yes, Sir.

8

handcuffed at the time, and the agents were not pointing any weapons at him during the exchange.

Inside the wallet, Quintana found a receipt for a storage unit and a receipt for a hotel room. The receipt for the storage unit reflected that Zambrano had rented the unit the previous afternoon at around 2:00 p.m., which coincided with the arrest of codefendant Roman. Quintana also noted that the keys that were removed from Zambrano's pocket included a key that he believed was to a rented storage unit. In addition, Quintana found a card with an access code to the gate at a storage facility and the number to a specific storage unit. Finally, Zambrano assisted Quintana in accessing the cell phones and told him that one of the numbers on the phone log was Mejia's phone number.

Following the search of Zambrano's belongings, agents went to the storage facility, where they were provided with a ladder so they could look through the mesh covering and into the unit. Agents saw firearms and storage cases for firearms. A crack in the door of the storage unit also allowed agents to peer in and see firearms.

After seeing the contents of the storage unit through the mesh covering, Agents arrested Zambrano and obtained a search warrant for the unit. The subsequent search revealed AR-15 rifle parts and storage cases, a vice with shavings in it, a dremel tool, and ammunition, among other items. Agents also

9

went to the hotel listed on the receipt found in Zambrano's wallet and discovered Mejia there. Zambrano had rented the hotel room for Mejia.

## II. Motion to Suppress

Zambrano contends federal agents violated his Fourth Amendment rights when they stopped him and searched his pockets. He argues that the district court erred when it denied his motion to suppress.

Before addressing the substance of Zambrano's argument, though, we must first consider an issue of waiver. The government claims that we should not entertain Zambrano's Fourth Amendment argument at all because he failed to object to the magistrate judge's report and recommendation on the motion to dismiss and therefore waived the argument. We agree that, typically, a lack of objection would result in a waiver. *See* 11th Cir. R. 3-1. But we find no waiver here because the record reveals that the magistrate judge did not provide adequate notice to Zambrano of the consequences of his failure to file written objections to the recommendation. *Cf. Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1257 (11th Cir. 2017) (noting that under 11th Cir. R. 3-1, a party who fails to object to a magistrate's findings in an R&R waives the right to challenge those findings on appeal "provided the party was given proper notice of the objection time period and the consequences of failing to do so.") Having found no waiver, we address Zambrano's argument.

10

Zambrano notes that agents believed him to be Mejia and thought Mejia was involved in a conspiracy to illegally export firearms.  But Zambrano asserts that this is not the type of criminal activity that would warrant an immediate interaction by police under *Terry*.[3]  In addition, Zambrano argues no evidence existed that would support a reasonable conclusion that he was armed and presently dangerous when agents approached him, even under the mistaken belief that he was Mejia. Finally, even if these two conditions were present, Zambrano contends that the search inside his pockets went beyond what the law permits.[4]  We disagree.

"A ruling on a motion to suppress presents a mixed question of law and fact."  *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) (citation omitted).  When reviewing the district court's denial of a motion to suppress, we

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

[4] Zambrano has waived any argument that the misidentification aspect of his initial stop violated his Fourth Amendment rights.  While Zambrano mentioned the misidentification in his initial brief, he did not advance any arguments to support a theory that his Fourth Amendment rights were violated based on the misidentification.  *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012) (a passing reference to an issue in a brief is not sufficient, and the failure to make arguments and cite authorities in support of an issue waives it); *see also Singh v. U.S. Att'y Gen.,* 561 F.3d 1275, 1278 (11th Cir. 2009) (per curiam) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.").

We also do not address the initial pat-down of Zambrano conducted by the agents because Zambrano does not contest this action in his appeal.  Similarly, we do not address whether the agents' use of the ladder to peer into the storage unit was a constitutional violation because, that too, was not raised by Zambrano in this appeal.  While we recognize that Zambrano mentioned this issue in his reply, we do not consider arguments raised for the first time in a reply brief.  *See United States v. Fiallo-Jacome*, 874 F.2d 1479, 1481 (11th Cir. 1989) (appellant in a criminal case may not raise an issue for the first time in a reply brief); *see also Hamilton*, 680 F.3d at 1319 (failure to make arguments and cite authorities in support of an issue waives it).

11

review the district court's "findings of fact for clear error and its application of law to those facts de novo." *United States v. Gibson*, 708 F.3d 1256, 1274 (11th Cir. 2013); *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007).  When we conduct such a review, we view the facts in the light most favorable to the government.  *Id.* at 1235-36.  We also afford substantial deference to the district court's credibility determinations.  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

Under the Fourth Amendment, a police officer may stop and briefly detain an individual for investigative purposes if the officer has a reasonable suspicion that the person was or is about to be involved in criminal activity.  *Id.*  (citations omitted).  We determine whether an investigatory stop is lawful under the Fourth Amendment by considering (1) "whether the stop was justified at its inception" and (2) "whether the officer's actions were  reasonably related in scope to the circumstances that justified the stop in the first place."  *United States v. Griffin,* 696 F.3d 1354, 1358 (11th Cir. 2012) (citation omitted).   In making this determination, we look to the "totality of the circumstances."   *Id.* (citation omitted).

Once an officer has stopped an individual, he may conduct a "pat-down" or "frisk" if he reasonably believes that his safety, or that of others nearby, is threatened. *Id.* at 1359. The officer "must be able to point to particular facts from

12

which he reasonably inferred that the individual was armed and dangerous," and the search must be reasonably limited in scope to protecting the officer by "disarming a potentially dangerous man." *Sibron v. New York*, 392 U.S. 40, 64-65 (1968); *see also Terry,* 392 U.S. at 29.

Zambrano argues that there was no evidence to suggest that he was armed and presently dangerous. But *Terry* does not demand "definitive evidence of a weapon or absolute certainty that an individual is armed." *Griffin*, 696 F.3d at 1359. In evaluating whether reasonable suspicion exists under *Terry*, we look to probabilities, not hard certainties. *Id.* Ultimately, the issue is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (citation omitted). When evaluating the totality of the circumstances, this Court does not consider each fact in isolation, and we may consider the crime for which the suspect was sought. *Id.* at 1359-60 (citing *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)); *See also United States v. Matchett*, 802 F.3d 1185, 1192 (11th Cir. 2015).

Agents arrived at Mejia's house in order to conduct surveillance and ultimately arrest Mejia for arms trafficking. Zambrano does not appear to contest the agents' determination that probable cause existed to arrest Mejia. If probable cause existed, the reasonable suspicion necessary to effect a *Terry* stop certainly existed as well. And agents were justified in stopping Zambrano as he exited

13

Mejia's residence because they had a good-faith belief that Zambrano was Mejia under the circumstances. *See Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) and *Hill v. California*, 401 U.S. 797, 804 (1971); *see also United States v. Gonzalez,* 969 F.2d 999, 1004–06 (11th Cir. 1992) (explaining that an officer's objectively reasonable, good-faith misidentification while conducting surveillance may support probable cause to arrest).

In light of the evidence against Mejia and the seriousness of the crime of which he was suspected—trafficking high-powered rifles—a reasonably prudent officer in the circumstances would be warranted in believing that his safety or that of others was in danger when he encountered who he believed was Mejia leaving the residence. Agent Lopez testified that he was aware that Mejia was being arrested for weapons trafficking and that arms traffickers are considered to be potentially dangerous. Agent Quintana also testified that he had a strong belief that firearms would be located at Mejia's residence. Under these circumstances, we cannot conclude that it would be unreasonable for agents to believe that Mejia might be armed and presently dangerous. It was therefore also reasonable for agents to stop and briefly detain Zambrano, since they believed him to be Mejia.

Next, Zambrano challenges the fact that Lopez's action in reaching into Zambrano's pocket following the initial pat-down. He argues that *Terry* authorizes only a "carefully limited search of the outer clothing" in an attempt to discover

14

weapons which might be used to assault the officer. Zambrano contends that Agent Lopez went beyond what is authorized by *Terry,* reaching into Zambrano's pockets "without any regard for whether the objects might be weapons." [5] Again, we disagree.

First, if a police officer lawfully pats down a suspect's outer clothing and feels an object that he reasonably believes may be a weapon, the officer may continue a *Terry* search. *United States v. Clay,* 483 F.3d 739, 743 (11th Cir. 2007) (citations omitted). The purpose of a protective search under *Terry* is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Consequently, an officer is entitled to ensure his safety by searching a person's pocket after an initial pat-down supplies reason to believe that the item concealed might be a weapon. *Clay*, 483 F.3d at 744; *see also Griffin*, 696 F.3d at 1363.

Here, Agent Lopez testified during the suppression hearing that when he conducted the pat-down of Zambrano, he felt "bulky items in his pockets." And though Lopez stated that he did not know what the objects in Zambrano's pockets were, he testified that he thought the items could have been a weapon. Lopez also

---

[5] As noted above, Zambrano waived any argument that the initial "pat-down" was improper. Aside from failing to properly raise the issue on appeal, during the suppression hearing, Zambrano did not contest that he had been patted down when stopped by Agent Lopez. During closing arguments at trial, Zambrano's attorney stated, "I also understand why Special Agent Lopez patted down my client. I get that. They do that for officers' safety."

15

testified that this belief was the reason he pulled the items out of Zambrano's pocket.  After that, Lopez placed the items (consisting of four cell phones, a wallet, and keys) on the hood of the car.  While the items turned out not to be weapons, it would not have been unreasonable for Lopez to believe they were under the circumstances.  Lopez explained in his testimony, "[W]e get all sorts of bulletins with what weapons may be.  You have cell phones that are guns.  You have knives that are credit cards, sir."  And in this case, he was dealing with an arms trafficker and felt hard, bulky items in his pocket.  Under the circumstances, that the items were in fact cell phones does not negate the reasonableness of his belief that they could have been weapons.  *See Clay*, 483 F.3d at 741, 743 (holding that the seizure from the defendant's pocket of an empty ball-point pen barrel was reasonable because, although such an object often is used as a device for ingesting narcotics, the officer "could not tell by feel whether it was a weapon," such as a screwdriver, and the search was conducted in order to ensure the officer's safety).

Finally, any argument by Zambrano that the further inspection of the items retrieved from his pockets violated his Fourth Amendment rights also fails.  Agent Quintana testified that Zambrano gave consent for him to search the items.  According to Quintana, he asked Zambrano in Spanish if it was okay to look through the items (the cell phone and wallet).  Zambrano responded, "Yes, sure."  Zambrano was so cooperative that he even showed Quintana how to access his cell

16

phone.  Nor during the suppression hearing did Zambrano dispute that he had consented.  The magistrate judge also found Quintana to be credible and acknowledged that Zambrano's consent was "unrefuted."

Searches conducted by means of consent are valid, so long as the consent is voluntary.  *See United States v. Kapperman*, 764 F.2d 786, 793 (11th Cir. 1985); *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) ("In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice.").  Nothing here supports a conclusion that Zambrano's consent was not voluntary.

Zambrano was not handcuffed when he gave Quintana consent to further search the items.  Nor does any evidence exist that agents pointed their guns or otherwise threatened or intimidated Zambrano when he gave his consent.  Moreover, the lower court found Quintana to be credible in his testimony.  Credibility determinations are typically within the province of the fact finder since that person observes the testimony and demeanor of the witness, thereby placing him in a better position than an appellate court to assess the credibility of the witness.  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).  We also afford substantial deference to the district court's credibility determinations.  *Lewis*, 674 F.3d at 1303.

17

Ultimately, we find that the district court did not err in denying Zambrano's motion to suppress.  Under the circumstances, agents were justified in their initial stop of Zambrano as well as the subsequent pat-down and search of his pockets. And the search of Zambrano's wallet and phone, which revealed Mejia's phone number, the hotel where Mejia was staying, and the name of a storage unit rented by Zambrano, likewise did not violate Zambrano's rights.  Zambrano's consent validated the search.

### III.    Sufficiency of the Evidence

Zambrano was convicted of one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371.  As we have noted, this count alleged that Zambrano and co-defendants Mejia and Roman conspired to (1) knowingly make false statements to firearms dealers, in violation of 18 U.S.C. § 922(a)(6); (2) knowingly and willfully export firearms outside the United States (to Colombia) without a license, in violation of 22 U.S.C. § 2778(b)(2), (c), and 22 C.F.R. §§ 121.1(g)-(h), 127.1(a)(1); and (3) conceal and facilitate the exportation of firearms, in violation of 18 U.S.C. § 554.  Zambrano contends that the government failed to prove beyond a reasonable doubt that he was guilty of conspiring to commit each of the offenses.

We review *de novo* the sufficiency of the evidence to support a conviction. In doing so, we view all of the evidence "in the light most favorable to the

government and draw[] all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014) (citation and internal quotations omitted). In conducting this review, we are cognizant that the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990) (citation omitted). This is so because "[a] jury is free to choose among reasonable constructions of the evidence." *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983) (citation and internal quotations omitted).

To establish a conspiracy under 18 U.S.C. § 371, the government must show "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003) (citation omitted). The existence of an agreement may be established by circumstantial evidence, *United States v. Silvestri*, 409 F.3d 1311, 1329 (11th Cir. 2005), but the government must "show circumstances from which a jury could infer beyond a reasonable doubt that there was a meeting of the minds to commit an unlawful act." *United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004) (quotation omitted).

19

**A.**

Zambrano argues on appeal that the evidence was not sufficient to convict him of conspiracy to violate 18 U.S.C. § 922(a)(6) because the government failed to prove beyond a reasonable doubt that Mejia and Roman were not the "actual buyers" of the guns at issue.[6]   He argues in the alternative that the government failed to present evidence that Zambrano knew that Roman and Mejia were required to fill out ATF Form 4473 when they purchased the firearms or that they had made any material false statement on the Forms when they purchased the firearms.

Section 922(a)(6) makes it unlawful

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such

---

[6] When purchasing a firearm from a federally licensed dealer, the buyer is required to fill out the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Form 4473, which requests the buyer's name, date of birth, address, and other identifying information.  One of the questions the form poses, Question 11.a., is the following:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.**

The dealer asks this question to ensure that the buyer of the gun is not a straw purchaser and that the identifying information and background check are of the right person. *See United States v. Frazier*, 605 F.3d 1271, 1280–81 (11th Cir. 2010).

20

importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

18 U.S.C. § 922(a)(6). In order to convict a defendant under § 922(a)(6), the government must prove beyond a reasonable doubt that (1) the defendant knowingly made; (2) a false or fictitious written statement in connection with the purchase of firearms; (3) intended to deceive or likely to deceive a licensed firearms dealer; (4) and the false statement was a fact material to the lawfulness of the sale or disposition of the firearm. *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003) (per curiam) (citations omitted); *United States v. Frazier*, 605 F.3d 1271, 1278-79 (11th Cir. 2010). Specific intent is not an element of the offense. *Ortiz*, 318 F.3d at 1036 n.10 (citing *United States v. Hawkins*, 794 F.2d 589, 591 (11th Cir. 1986)). This Court has previously noted that the identity of the actual purchaser is clearly "a fact material to the lawfulness of the sale" of a firearm under 18 U.S.C. § 922(a)(6). *See United States v. Klais,* 68 F.3d 1282, 1283 (11th Cir.1995) (per curiam); *Ortiz*, 318 F.3d at 1036-37.

The crux of Zambrano's argument is that the facts of this case do not constitute an impermissible "straw purchase," so the purchase cannot be considered an unlawful objective of the conspiracy. He claims that here, even construing the facts in the light most favorable to the government, no false statement was made when Mejia and Roman purchased the firearms because they

21

were the actual purchasers.  According to Zambrano, the fact that they had the intent to later sell the firearms does not negate the fact that they were actual purchasers under the law.

"Straw purchases . . . misrepresent the identity of the purchaser in a firearm sale and violate 18 U.S.C. § 922(a)(6)." *See Ortiz*, 318 F.3d at 1037 (citing *United States v. Nelson*, 221 F.3d 1206, 1210 (11th Cir. 2000) (internal quotation marks omitted).  We have explained that straw purchases of firearms occur when an unlawful purchaser uses a lawful "straw man" to obtain a firearm.  *Id.* (citing *Nelson*, 221 F.3d at 1209).  In the case of an ineligible purchaser, there is no requirement that the person supply money up front in order for a straw purchase to occur.  *Id.*  Nor is direct evidence required that the purchase of the weapon had been agreed to before the purchase occurs.  *Id.*  A straw transaction occurs when a defendant "at the time of completing Form 4473 had no intention of keeping the firearms or giving them as a gift."  *Id.* at 1038.  We have reasoned that "[i]f an ineligible buyer could simply use a 'straw man' or agent to obtain a firearm from a licensed dealer, the statutory scheme would be too easily defeated."  *Id.* at 1037 (citation omitted).

We have further held that, regardless of whether all of the actors were lawfully eligible to purchase a firearm, a person is not an actual purchaser when he or she buys a firearm for another and lists himself or herself as the purchaser on

22

ATF Form 4473. *Frazier*, 605 F.3d at 1280. Indeed, under those circumstances, a person violates § 922(a)(6) whether or not the true buyer could have legally purchased the gun without the "straw man." *Abramski v. United States*, 134 S. Ct. 2259, 2263 (2014).

The Supreme Court has said that "§ 922, in regulating licensed dealers' gun sales, looks through the straw to the actual buyer." *Id.* at 2267. This is because the federal statute "establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background." *Id.* (citation omitted). The goals of this scheme are twofold: to "keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Id.* (citation omitted). In light of these goals, the Supreme Court has construed Question 11.a. on ATF Form 4473—which asks are you the actual buyer—as asking "are [you] acquiring the firearm(s) on behalf of another person[?]" *Id.* at 2272 (alteration in *Abramski*).

Here, the evidence at trial showed that the items used to conceal the firearms during shipment were purchased at approximately the same time that the firearms were purchased. The sequence of these purchases indicates that Mejia and Roman had no intention of keeping the firearms for their own use. The § 922(a)(6) charges stem from three separate ATF Form 4473s that were admitted into evidence. The first Form was executed by Mejia with respect to the Barrett .50-

caliber firearm purchased in Jensen Beach, Florida, on July 31, 2014. Although the firearm was purchased on July 31, 2014, the package containing part of the firearm was delivered to the shipping company the very next day, on August 1, 2014. And the firearm was included in a package containing a cargo carrier, in an attempt to disguise the firearm. The jury was presented with evidence that Zambrano bought the cargo carrier on July 31, 2014, the same day that Mejia purchased the firearm in Jensen Beach.

As the jury heard, after discovering that the package contained a firearm, law enforcement allowed the package to be sent to Colombia so that Colombian law enforcement could track it. Once the package reached its destination, Colombian authorities searched the house and found other packages and weapons parts. Agents were able to trace the items found in the house in Colombia to Zambrano. They were also able to discern that Zambrano had purchased the items at a Walmart located in Coral Springs. And one of the boxes found in the house in Colombia contained a hammock, which had been shipped by "Correa." Video evidence played for the jury showed Zambrano, wearing sunglasses, carrying the box and paying cash for the shipment. The Colombian police discovered firearm parts in the hammock box at the house.

As for the second Form 4473, the firearms dealer, James Smith, testified that he sold the weapon to Roman on February 9, 2016. Only days later, on February

24

15, 2016, part of that same firearm was discovered by a Colombian inspector in Colombia.  The airway bill associated with the package identified the person shipping the item as "Belalcazar."  The person claiming to be "Belalcazar" was later identified as Mejia.  Further, the jury heard evidence that the item used to conceal this shipment was a cargo carrier purchased on February 11, 2016, by Mejia.  And the package was shipped the following day, on February 12, 2016. Again, the purchase of the firearm occurred only two days prior to the purchase of the cargo carrier—the item used to conceal the shipment of part of the firearm. And the firearm part was shipped the next day and found by law enforcement in Colombia shortly thereafter.

And finally, the third Form 4473 was executed when Roman bought another weapon from Smith on March 19, 2016.  Unlike with the other transactions, the weapon was seized immediately after its purchase by Roman.  Evidence presented to the jury demonstrated that immediately after Roman's arrest, Roman contacted Mejia to alert him that law enforcement was on to the scheme.  The evidence also revealed that after receiving this call, Zambrano rented a storage facility.  In addition, he rented a hotel room for Mejia.  And items that could have been used to

conceal the shipment of the firearm purchased on March 19, 2016, were found in the storage unit (*e.g.*, a grill, smoker, and table saw).[7]

These facts, viewed in the light most favorable to the government, support a finding by a reasonable jury that Mejia and Roman never intended to keep the firearms for themselves when they purchased them. Because a reasonable jury could conclude that, at the time Mejia and Roman completed the ATF Forms 4473 they had no intention of keeping the firearms—but rather, intended to immediately chop them up for parts and ship them to Colombia—it could reasonably conclude that the men misrepresented that they were the actual purchasers on the ATF Forms. *See Ortiz*, 318 F.3d at 1038.

Next, although Zambrano was never present during any of the firearm purchases, more than enough circumstantial evidence supported the conclusion that Zambrano was aware that his co-conspirators were providing materially false statements when they purchased the firearms. Zambrano himself used an alias and a false address when shipping items to Colombia. He also wore sunglasses to further conceal his identity when making shipments. Zambrano chose to use different shipping companies on consecutive days when making shipments. And he used cash, so the transactions could not be traced.

---

[7] Testimony also revealed that a grill, smoker, and table saw were purchased on March 20 and 22, 2016.

His involvement with Mejia and Roman was also clear from their interactions. Video surveillance showed Mejia shopping with Zambrano at Walmart. During this shopping trip, Zambrano used cash to pay for the concealment items, but he used a credit card for other items. Zambrano was also seen on the other store surveillance video shopping for concealment items with Mejia. And after Roman was arrested in the Tampa area, Zambrano rented the storage unit where various firearms and concealment items were found. He also rented the hotel where Mejia hid from law enforcement.

And finally, the vise with metal shavings and the tools that could be used to obliterate serial numbers, which were found at the storage unit Zambrano rented, supported the conclusion that Zambrano knew his coconspirators had obtained the guns in violation of ATF regulations. Significantly, the serial numbers had been obliterated on the weapons found in the packages seized here in the United States and in Colombia. In view of these facts, reasonable jurors could have concluded that the coconspirators obliterated the serial numbers of the weapons they shipped to protect themselves from being identified as the purchasers of the firearms, since the purchases were in violation of ATF regulations. Obliterating the serial numbers on the firearms was not necessary to conceal the fact that the conspirators were the ones who shipped the firearms overseas, had the firearms been legally obtained in accordance with ATF regulations. That was the purpose of shipping

27

from different shippers virtually every time, using aliases and false shipping addresses, and wearing sunglasses while shipping.

All of these facts support a finding by a reasonable jury that Zambrano was aware of and involved in the illegal scheme and knew that Mejia and Roman would also be using means to deceive firearms dealers when making the purchases. For these reasons, we affirm the conviction with respect to the conspiracy to purchase firearms by means of materially false statements.

**B.**

Zambrano also argues that the evidence against him with respect to the unlawful exportation and smuggling of firearms outside the United States was not sufficient to secure a conspiracy conviction. He notes that a charge of conspiracy to illegally export firearms requires evidence of specific intent but contends that the government presented no direct evidence of such specific intent on his part. Zambrano also asserts that the circumstantial evidence presented at trial was limited and did not support a reasonable inference of his specific intent to conspire to illegally export firearms.

When an item has been designated as a "defense article," a private party like Zambrano ordinarily may not export it from the United States without a license or

28

written approval from the government.[8]  *United States v. Man,* 891 F.3d 1253, 1265 (11th Cir. 2018).  The commercial export of arms and ammunition from the United States is governed by the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Traffic in Arms Regulations, 22 C.F.R. §§ 121–30.  *See United States v. Adames*, 878 F.2d 1374, 1376 (11th Cir. 1989) (per curiam).  But § 2778 imposes criminal sanctions only on individuals who "willfully" violate the AECA and regulations promulgated thereunder.  *Man*, 891 F.3d at 1265, 1267; *Adames*, 878 F.2d at 1377.  The requirement of willfulness connotes a "voluntary, intentional violation of a known legal duty."  *Id.* (citing *United States v. Davis*, 583 F.2d 190, 193 (5th Cir. 1978)).  Congress did not intend to impose criminal penalties on "innocent or negligent errors."  *Id.*

In order to convict a person on under § 2778, the government must prove specific intent—that the defendant "knew that it was unlawful to export the [firearms]" and "intentionally violated [the] known legal duty not to export [them]."  *Man*, 891 F.3d at 1268 (citing *Adames*, 878 F.2d at 1377) (alteration in *Man*).  Evidence that a criminal defendant merely "was aware of the generally unlawful nature of [his] actions" is not sufficient to sustain a conviction.  *Id.* (citing *Adames*, 878 F.3d at 1377).

---

[8] Here, the parties stipulated to the fact that the items shipped were "defense articles" and, thus, required a license for export.  They also stipulated that neither Zambrano nor his co-conspirators had such a license.

We first note that the government was not required to demonstrate Zambrano's awareness of § 2778 to show his specific intent with respect to the conspiracy. *See Byran v. United States*, 524 U.S. 184, 189, 191-193 (1998) (finding that a law that punishes individuals who "willfully engag[e] in the business of dealing in firearms [without a license]" does not require the government to prove that the defendant "was aware of the federal law."); *see also Liparota v. United States*, 471 U.S. 419, 434 (1985). And to prove Zambrano's intent, the government was able to rely on "circumstantial evidence, such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Man*, 891 F.3d at 1265 (citation and internal quotation marks omitted). Where the government relies on circumstantial evidence, though, "reasonable inferences, and not mere speculation, must support the jury's verdict." *Id.* (citation omitted). Here, we find that sufficient circumstantial evidence supported a finding by the jury that Zambrano had the specific intent to conspire to illegally export firearms.

At the outset, we note that this case is distinguishable from *Adames*, a case relied upon heavily by Zambrano. In *Adames*, the defendant was a vice-consul at the Panamanian consulate in Miami and assisted her brother, who had an investigation and security firm in Panama, with shipping firearms in order to gain a more favorable rate for shipment. *Adames*, 878 F.2d at 1375. In *Adames*, we

30

found that the evidence elicited at trial failed to prove that the defendant acted willfully because "[t]he evidence demonstrate[d], at most, that Adames was negligent in not investigating the legal prerequisites to the exportation of firearms." *Id.* at 1377. We noted that the evidence did not prove that she "intentionally violated a known legal duty not to export the firearms or purposefully perpetuated her ignorance of the [law] to avoid criminal liability." *Id.*

In contrast, the evidence presented at trial here sufficiently established that Zambrano willfully assisted in the exportation of firearms without a license, knowing that his conduct was prohibited. Zambrano's participation in several aspects of the conspiracy and the manner in which the shipments were made supports a reasonable inference by the jury that Zambrano was aware that the exportation of the firearms was illegal.

First, this case involves a conspiracy to export military-style weapons such as AR-15s and Barrett .50 caliber rifles—items that were found in a storage unit rented by Zambrano. During trial, the jury heard the testimony of a Colombian police officer, who stated that these types of firearms cannot be legally possessed by civilians in Colombia and instead are bought on the black market by criminals. Testimony also revealed that the firearms were not shipped intact. Rather, the weapons were broken apart and shipped in pieces to Colombia. The AR-15s found

in the storage unit were also broken apart.  That is not something generally done with legally shipped items.

Second, Zambrano and his co-conspirators took purposeful steps to conceal the exportation of the firearms.  They hid the firearm parts in boxes containing pedestrian items such as a car grill or a hammock.  And Zambrano was seen on surveillance video with Mejia buying concealment items with cash while using a credit card for other items during the same trip.  Zambrano also used an alias and false address when he made shipments in an effort to conceal the identity of the shipper.  And Zambrano used different shipping companies, paid in cash, and wore sunglasses to conceal his identity.  Again, there is no reason to undertake all of these steps if a shipper does not know that exportation of the firearms he is shipping is illegal.

Third, when Zambrano completed air bills to make shipments, he falsely listed the contents of the package.  The airway bills signed by Zambrano also listed various prohibitions and required him to represent that certain items, such as pistols, were not being shipped.  It was reasonable for a jury to infer from these facts that Zambrano knew it was illegal to ship firearm parts attached to concealment items outside of the United States.

Finally, after his arrest, Roman told Mejia that law enforcement had taken the rifle he purchased.  After Mejia received this information, both Zambrano and

32

Mejia jumped into action to hide the evidence against them in a storage locker. Zambrano also rented a hotel room to hide Mejia from detection.

All of this evidence, taken together, was more than sufficient for a reasonable jury to conclude that Zambrano had the specific intent to conspire with Mejia and Roman to unlawfully export the firearms. And the manner in which parts of the firearms were shipped also supports a finding that Zambrano conspired to conceal the illegal exportation (the third object of the conspiracy charged).[9] If Zambrano believed his actions to be lawful, he and his co-conspirators would not have taken great pains to conceal their identities when purchasing and shipping the items. The fact that the firearms were chopped up and later shipped while attached to concealment items also supports this finding. Finally, the fact that Zambrano had control over the storage facility further demonstrates his knowledge of the items.

For all of these reasons, and taking the evidence in the light most favorable to the government, it was reasonable for the jury to conclude that Zambrano knew of the unlawful objects of the conspiracy and had the specific intent to engage in

---

[9] In his brief, Zambrano suggests that evidence was not sufficient to support his conviction for conspiracy to conceal the exportation of firearms (in violation of 18 U.S.C. § 554), but he does so in a conclusory manner. It appears that Zambrano claims, because he could not be convicted of conspiring to export firearms, he also could not be convicted of conspiring to conceal the unlawful exportation of the firearms. For the reasons we have already discussed, we disagree.

the conspiracy to illegally export the firearms.  We therefore affirm Zambrano's conviction for conspiracy because the evidence was sufficient to sustain the conviction.

## IV.    Reasonableness of the Sentence

Finally, Zambrano asserts that his 60-month sentence—the maximum under the applicable statute—was substantively unreasonable because it was greater than necessary to meet the goals of sentencing under 18 U.S.C. § 3553(a).  He claims he was a first-time offender who played a lesser role in the overall offense, and he argues no evidence exists that he enriched himself greatly as a result of the offense.  Zambrano contends the district court failed to properly consider his characteristics, his lack of criminal history and his limited actions, and how those characteristics "clearly placed him outside the sphere of the worst offender deserving the maximum penalty prescribed by Congress."  We disagree.

We review the substantive reasonableness of a sentence for an abuse of discretion.  *See United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (en banc) (citing *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Williams*, 527 F.3d 1235, 1247-48 (11th Cir. 2008).  To prevail, Zambrano must show that his sentence is unreasonable in light of the record and the § 3553(a) factors.  *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).  The substantive reasonableness of a sentence is determined taking into account the

34

totality of the circumstances, "including the extent of any variance from the Guidelines range." *United States v. Alfaro-Moncada*, 607 F.3d 720, 735 (11th Cir. 2010) (quotation omitted).

A district court must evaluate all of the § 3553(a) factors when deciding on a sentence. *Id.* The factors listed in § 3553(a) include the need for the sentence imposed, which includes the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). The court is also required to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the guidelines range, policy statements issued by the Sentencing Commission, the need to avoid unwarranted sentence disparities among defendants with similar records, and the need to provide restitution to victims. *Id*. at § 3553(a). The court must impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

District courts' decisions with respect to sentencing are to be given "due deference," and this Court may vacate the sentence only "'if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'" *United*

35

*States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (quoting *United States v. Pugh,* 515 F.3d 1179, 1191 (11th Cir. 2008)).

Considering the totality of the circumstances, we conclude that the district court did not commit a clear abuse of discretion when it sentenced Zambrano to 60 months' imprisonment. First, the sentence was within the Guidelines range. We generally expect a sentence within the Guidelines range to be reasonable. *Alfaro-Moncada*, 607 F.3d at 735. Zambrano's advisory guidelines range was 78 to 97 months' imprisonment based on a criminal history category of I and adjusted offense level of 28. But since the maximum sentence set forth at 18 U.S.C. § 371 was five years, his guidelines "range" became 60 months. Zambrano's sentence was also within the statutory maximum.

Next, the transcript of the sentencing hearing demonstrates that the district court acknowledged the factors set forth in § 3553(a) and considered them when fashioning a sentence. And in issuing his sentence, the district judge explained as follows:

> The Court, in determining a sentence sufficient, but not greater than necessary, shall consider the need for the sentence imposed to reflect the seriousness of the offense—and certainly this illegal shipment of firearm parts with obliterated serial numbers hidden in metal-type purchases is a very serious offense—as well as the need for the sentence imposed to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct not only of this

Defendant, but other persons who may be considering such conduct.

Given the seriousness of the offense, given the Defendant's participation in several levels of this offense . . . [and] given the need for the sentence imposed to promote respect for the law, to provide just punishment, to afford adequate deterrence not only to this Defendant, but other persons, and given the seriousness of the offense in that this involved very serious firearms being illegally shipped to Colombia, he is already getting a variance, quite frankly, from the 78 months because the Government chose to only charge him with a 371 charge, which is a 60-month maximum.

And given the fact that the other two Defendants, who I find—and I found at all the hearings—that I really found that they were equally culpable—I find that the 60-month sentence is the appropriate sentence.

After reviewing the district court's reasoning, it is clear that Zambrano's arguments—that the court failed to consider his characteristics as a first time offender, and that it failed to consider the severity of the offense—lack merit. The district court considered both, expressly reviewing Zambrano's role in the offense and finding it to be equal to his co-defendants who also received 60-month sentences. The district court also specifically noted that Zambrano lacked any criminal history. The court considered Zambrano's request for a downward variance based on his argument that he was a minimal player in the overall conspiracy but rejected it. A sentencing judge need only "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a

37

reasoned basis for exercising his own legal decisionmaking authority." *United States v. Livesay*, 525 F.3d 1081, 1090 (11th Cir. 2008) (citation and internal quotation marks omitted); *See also United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007) ("an acknowledgment by the district judge that he or she has considered the § 3553(a) factors will suffice."). Here, it did.

We are not left with the "definite and firm conviction" that the district court committed a clear error of judgment in imposing a 60-month sentence.

## V. Conclusion

For all of the reasons we have set forth, we affirm Zambrano's conviction and sentence.

**AFFIRMED.**